**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 2, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

AMANDA L. BOUCHER,

Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

Defendant-Appellee.

No. 09-3139
(D.C. No. 6:08-CV-01070-JTM)
(D. Kan.)

---

**ORDER AND JUDGMENT*\***

---

Before **KELLY**, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

Amanda L. Boucher appeals from an order of the district court affirming

the Commissioner's decision denying her application for Social Security benefits.

We have jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g) and we

affirm.

---

\*      After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. Background

Ms. Boucher filed an application for Disability Insurance Benefits on October 10, 2005, alleging that she became disabled on May 10, 2003. The agency denied her application initially and on reconsideration. At her request, Ms. Boucher received a de novo hearing before an administrative law judge (ALJ). The ALJ determined that Ms. Boucher was severely impaired due to chronic pain syndrome, osteoarthritis, right shoulder impingement, hypertension, irritable bowel syndrome, and hypothyroidism. He also found that she had a non-severe knee disorder and a non-severe depressive disorder. The ALJ concluded, however, that Ms. Boucher did not have any impairment or combination of impairments that equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 and that she had the residual functional capacity to perform sedentary work. Although the ALJ found that Ms. Boucher could not return to her past work, he determined that she could perform a significant number of jobs in the national economy. As a result, the ALJ denied Ms. Boucher's application for benefits, concluding that she was not disabled at step five of the analysis. *See Williams v. Bowen*, 844 F.2d 748, 75052 (10th Cir. 1988) (explaining five-step process for evaluating claims for disability benefits). The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision. Ms. Boucher appealed the ALJ's decision to the district court and that court affirmed the ALJ's decision. This appeal followed.

## II. Discussion

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). On appeal, Ms. Boucher argues that the ALJ erred in assessing her residual functional capacity (RFC), and in determining that she could perform other work at step five.

### A. The RFC Determination

After considering all of the record evidence, the ALJ made the following RFC determination:

> [T]he claimant is restricted by arthritis in the hands and spine and by her shoulder impairment to sedentary work, or work which requires lifting up to 10 pounds on an occasional basis, but lifting no more than nominal weight on a frequent basis, sitting up to 6 hours of an 8-hour day, and standing and/or walking up to 2 hours of an 8-hour day. The claimaint has nonexertional limitations precluding more than occasional reaching, handling, or fingering with the right upper extremity due to her shoulder impingement and cervicalgia. The claimant must avoid exposure to temperature and humidity extremes. She must also avoid exposure to vibration and to work hazards such as unprotected heights or being around dangerous moving machinery due to medication side effects.

Admin. R. at 20.

Ms. Boucher asserts that the ALJ erred in making her RFC determination because he erroneously evaluated (1) her mental impairment; (2) her hypothyroidism; (3) her pain and credibility; and (4) the opinion of her treating

-3-

physician. In making the RFC assessment, an ALJ considers how an impairment, and any related symptoms, may cause physical and mental limitations that affect what a claimant can do in a work setting. 20 C.F.R. § 404.1545(a)(1). The RFC represents "the most [a claimant] can still do despite [her] limitations." *Id.* For the following reasons, we conclude that the ALJ did not err in assessing Ms. Boucher's RFC.

### 1. *Mental Impairment*

Ms. Boucher argues that the ALJ erroneously evaluated her mental impairment. Although she includes this argument in the section of her brief challenging the ALJ's step four RFC determination, she does not articulate how this alleged error affected that determination. Instead, she appears to be challenging the ALJ's step two determination that her mental impairment is not severe. *See* Aplt. Br. at 11-16. An impairment is "not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. 404.1521(a).

The ALJ explained that "[m]ental disorders are evaluated by their effects on an individual's daily activities, social functioning, and concentration, persistence, and pace, and any resulting episodes of decompensation." Admin. R. at 17. He then considered Ms. Boucher's testimony and her medical records in evaluating each of these areas. For example, the ALJ noted that Ms. Boucher was "independent in living arrangements, travel, and shopping," and "[s]he maintains

-4-

a household for her family, which includes teenaged stepchildren, and does not require reminders for self care or medication." *Id*. at 18. The ALJ therefore concluded that Ms. Boucher "exhibits no more than mild restriction in activities of daily living." *Id*. The ALJ further determined that Ms. Boucher did not exhibit more than mild difficulty maintaining social functioning or maintaining concentration, persistence, or pace and that there was no evidence of repeated episodes of extended decompensation. *See id*. at 19. Although the ALJ noted that Ms. Boucher had seen a psychologist, Dr. Hertzler, who had assigned her a Global Assessment of Functioning (GAF) score of 55,[1] the ALJ discounted that score because it did not correspond to the essentially normal findings in the narrative portion of Dr. Hertzler's evaluation. Because the evidence showed only mild limitations in mental functioning, the ALJ found that Ms. Boucher did not have a severe mental disorder. Ms. Boucher challenges this finding, focusing on the ALJ's consideration of Dr. Hertzler's report.

Dr. Hertzler performed a one-hour consultative psychological evaluation on June 20, 2006. In his report, he stated that Ms. Boucher was on-time for the meeting, and that she was verbal and appropriate throughout the session. He also described her as gregarious and friendly, although he did note that she explained

---

[1]    A GAF score of 51-60 indicates "[m]oderate symptoms," or "moderate difficulty in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 34.

later in the session that she acted that way to cover up her feelings and issues.  He indicated that she appeared of average intelligence, her mood was good, her insight was "quite good" and she showed no signs of psychosis.  Admin. R. at 275.  He noted that Ms. Boucher had described a troubled childhood, including sexual abuse.  He reported that Ms. Boucher was responding well to medication, but she wanted assistance in dealing with how her past abuse affected her recent remarriage.  Dr. Hertzler's initial diagnostic impression was that Ms. Boucher had a moderate major depressive disorder, a posttraumatic stress disorder, a history of abuse, and a current and past year GAF score of 55.

Ms. Boucher did not return to see Dr. Hertzler after her initial appointment because she testified she did not want to "face those [painful] issues," and it was "easier to keep it all locked in than to let it out."  *Id.* at 325.  Other than this one visit, there is no evidence that Ms. Boucher sought treatment for her allegedly severe mental impairment.  As the ALJ correctly noted, Dr. Hertzler's GAF score appeared inconsistent with Dr. Hertzler's essentially normal description of Ms. Boucher from the appointment.  The ALJ's conclusion that Ms. Boucher's mental impairment was not severe is supported by substantial evidence in the record, including Ms. Boucher's testimony about her daily activities and level of functioning.

2. *Hypothyroidism*

Ms. Boucher next argues that the ALJ erred in evaluating her hypothyroidism because he did not include any limitations consistent with that condition in her RFC. Although the ALJ concluded that Ms. Boucher's hypothyroidism was a severe impairment, he noted that it had been under adequate control with medication. This conclusion is supported by the record evidence.

Ms. Boucher was diagnosed with hypothyroidism in June 2005 and she began taking Synthroid at that time to regulate her thyroid levels. She had some problems with edema related to her hypothyroidism in the first few weeks after her initial diagnosis, but her doctor increased her Synthroid dose and there were no reported problems with edema after that time. She had a follow-up appointment with her endocrinologist, Dr. Youssef Hassan, in January 2006. He noted that her last visit had been in July 2005 and he had to adjust her medication in between visits. Her labs were essentially normal in January 2006, although with a slightly elevated TSH so Dr. Hassan modified her Synthroid dose again. There are no further visits with Dr. Hassan in the record and no apparent changes in her medication.

At a June 2006 appointment with Dr. Joseph Luinstra, he noted that her hypothyroidism had been stable. *Id*. at 288. At an August 2006 visit with Dr. Luinstra, he noted that her TSH was normal from May 31. *Id*. at 285.

Ms. Boucher confirmed that her thyroid had been doing well at an October 4, 2006 appointment, although she complained of fatigue and wanted to have her levels checked at that time. *Id.* at 284. At two subsequent visits on October 10, 2006 and November 14, 2006 she denied excessive fatigue. *See id.* at 278, 282.[2]

Although Ms. Boucher's Synthroid dose had to be periodically adjusted after her hypothyroidism was diagnosed in June 2005, that fact does not refute the ALJ's conclusion that her condition was adequately controlled by medication, which is supported by the record evidence.[3] Because Ms. Boucher's hypothyroidism was generally under control with medication, the ALJ was not required to include any limitations from that condition in her RFC.

---

[2] Ms. Boucher argues that the October 16, 2006 comment where she denied excessive fatigue was made when she was visiting the clinic to have her knee evaluated and therefore her comment more likely pertained to her fatigue level in relation to her knee injury as opposed to her overall fatigue level. We disagree. As the district correctly court noted in its order:

> Dr. Luinstra's notes segregate specific findings as to Boucher's knee in one section of his report. The statement as to the lack of fatigue appears in a separate, general section of the report which is titled "Constitutional" and also includes observations that Boucher denied "change in appetite, weight loss, or diet change."

R. Vol. 1 at 180 (quoting Admin. R. at 282).

[3] Ms. Boucher now argues that the ALJ also erred by failing to address any limitations in her RFC for the extended period of time when her hypothyroidism was undiagnosed. *See* Aplt. Br. at 19-20. Because Ms. Boucher did not make this argument in the district court, *see* R. Vol. 1 at 22-24, we will not consider it for the first time on appeal. *See Crow v. Shalala*, 40 F.3d 323, 324 (10th Cir. 1994).

### 3. *Pain and Credibility*

Although the ALJ determined that Ms. Boucher's impairments could reasonably be expected to produce her alleged symptoms, the ALJ concluded that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. Ms. Boucher asserts that the ALJ erroneously evaluated her credibility and symptoms of pain. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted).

The ALJ properly considered objective and subjective factors and gave supporting reasons for his credibility determination. *See id*; *see also* 20 C.F.R. § 404.1529 (discussing how ALJ evaluates symptoms such as pain). The ALJ noted that the examination findings by Ms. Boucher's physicians have been essentially negative since December 2005; that Ms. Boucher was able to accomplish most daily activities, including driving, household chores, cooking, shopping, and visiting; and that Ms. Boucher's impairments were successfully treated with medication. Despite Ms. Boucher's argument to the contrary, the ALJ did acknowledge and consider the fact that Ms. Boucher was diagnosed with a pain syndrome. Admin. R. at 21. But the ALJ also indicated that the evidence, including Ms. Boucher's reports to her doctors, showed that her pain was fairly well controlled with medication. *See id*.

The ALJ next discussed Ms. Boucher's functional capacity evaluation (FCE) in which the physical therapist described Ms. Boucher's behavior as inconsistent and self-limiting. The ALJ noted that the objective findings from the FCE did not correlate with Ms. Boucher's performance during functional testing. The ALJ further referenced medical evidence documenting visits from 2002, 2003, 2005 and 2006 in which no swelling was reported, which contradicted Ms. Boucher's report of severe shoulder swelling with even the most minimal activity. The ALJ also discussed contradictions between Ms. Boucher's testimony at the hearing in regards to her pain and functional limitations with information she reported to the physical therapist during her FCE. After considering all the evidence, the ALJ ultimately concluded that the claimant was only partially credible because of the "totality of inconsistencies regarding objective findings and [Ms. Boucher's] testimony" as well as the "contradictions between [Ms. Boucher's] testimony and her reports to medical sources." *Id*. at 23. We conclude that the ALJ's credibility determination is supported by substantial evidence.

4. *Treating Physician*

Finally, Ms. Boucher argues that the ALJ erred in evaluating the opinion of her treating physician, Dr. Vello Kass. The ALJ gave controlling weight to Dr. Kass's recommendation that Ms. Boucher should be limited to sedentary work and should avoid repetitive use of her right upper extremity. But the ALJ did not

give controlling weight to Dr. Kass's recommendation that Ms. Boucher would do best with part-time work. The ALJ determined that Dr. Kass's recommendation for part-time work was based on Ms. Boucher's self-report, which the ALJ found not reliable. Ms. Boucher argues that it was error for the ALJ not to give controlling weight to all of Dr. Kass's opinion.

Ms. Boucher's initial argument is that the ALJ's characterization of Dr. Kass's opinion is factually erroneous. She contends the record does not support the conclusion that Dr. Kass's opinion about part-time work was based on her self-report. But the medical records from Dr. Kass do support the ALJ's characterization. For example, in his examination report from September 9, 2003, Dr. Kass notes that Ms. Boucher "feels she cannot work a 12 hour shift," *see id*. at 172-73, and then on September 18, 2003, Dr. Kass limits Ms. Boucher to working four to six hours a day, *see id*. at 171. Similarly, in his examination report from June 14, 2004, he notes that Ms. Boucher "said she is not able to do her regular work," *see id*. at 165, and he concludes his report by stating "[s]he would probably do best with just part-time work," *id*. at 164. There are no independent observations by Dr. Kass that would support a conclusion that Ms. Boucher could only work part-time.

Relying on *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002), Ms. Boucher next argues that it was error for the ALJ to reject a treating source opinion on the basis of the ALJ's evaluation of the claimant's credibility. First,

we note that the ALJ did not "reject" Dr. Kass's opinion. Rather, the ALJ

conducted the *Watkins* analysis[4] to determine what weight should be given to the

opinion and ultimately concluded that the part of Dr. Kass's opinion

recommending part-time work should not be given "substantial weight." Admin.

R. at 23-24. As the district court correctly noted,

> [this] case is therefore unlike *McGoffin*, where an ALJ had refused to
> consider the report of a treating physician based on the ALJ's
> subjective, "expressed doubt" that the physician had actually signed
> the report, even though—as the Court of Appeals pointed out— there
> was additional testimony from other witnesses, that the physician
> agreed with the report . . . . Thus, the court in *McGoffin* was
> addressing a case of outright rejection of a medical report, based
> only [on] rank speculation as to its authorship. Here, the ALJ
> conducted a proper credibility analysis and reached a permissible
> conclusion that the claimant was less than fully credible. It was not
> error for the ALJ to then use this conclusion as one factor among
> several in reaching a secondary finding that Dr. Kass's opinion
> should be given less than controlling weight.

R. Vol. 1 at 182-83.

Ms. Boucher argues also that the other reasons the ALJ gave for giving less

weight to Dr. Kass's opinion were erroneous. We again refer to the sound

reasoning of the district court:

> The ALJ correctly noted that the opinion by Dr. Kass restricting her
> to part-time work is not otherwise corroborated by other medical
> sources, was grounded on the subjective statements of a claimant
> who has otherwise been found to be less than fully credible, and was

---

[4]     *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-1301 (10th Cir. 2003)
(explaining factors for ALJ to consider when determining the appropriate weight
to give to a treating physician's opinion).

premised on an observation—that full-time work "seems to stress her too much," [Admin. R. at 162], which was a psychological conclusion outside the orthopedic surgeon's expertise. Boucher suggests that the stress reference in Dr. Kass's letter was physical stress, and thus within his area of expertise. Read in context, the stress in the report appears to be psychological in nature, with Dr. Kass deferring to conclusions offered by the pain specialist, Dr. Goel.

*Id*. at 182. We therefore agree with the district court's conclusion that the ALJ did not err in declining to give controlling weight to all facets of Dr. Kass's opinion.[5]

### B. The Step Five Determination

Ms. Boucher asserts the ALJ erroneously found that she could perform other work at step five of the sequential evaluation process. She argues the agency did not provide evidence of a "significant" number of jobs that she could perform. But Ms. Boucher focuses her argument on the jobs that are available in her local region when the proper inquiry is whether a significant number of jobs exist in the national economy. *See* 20 C.F.R. §§ 404.1560(c), 404.1566(a).

---

[5] Ms. Boucher also contends that the ALJ had a duty to recontact her treating physician. We disagree. The ALJ properly recognized that the duty to recontact a treating physician occurs when the evidence submitted is inadequate. *See* Admin. R. at 24. The ALJ concluded, however, that the records submitted by Dr. Kass were adequate for consideration but that they were not persuasive in showing that Ms. Boucher could not engage in full-time employment. *See id*. This reasoning is consistent with our decision in *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

When the ALJ concludes that a claimant cannot perform her past work, he must then decide whether a claimant can adjust to other work considering her RFC and other vocational factors. "Any other work (jobs) that [a claimant] can adjust to must exist in significant numbers in the national economy (either in the region where [the claimant lives] or in several regions in the country)." *Id*. § 404.1560(c)(1). The regulations expressly provide that: "It does not matter whether-- (1) Work exists in the immediate area in which [the claimant lives]; (2) A specific job vacancy exists for [the claimant]; or (3) [The claimant] would be hired if [she] applied for work." *Id*. § 404.1566(a). Based on the testimony of the Vocational Expert, the ALJ found that Ms. Boucher could work as either a charge account clerk, with 190,390 jobs in the national economy, 2,000 in Kansas, and 190 in the local region; or a call out operator with 79,400 jobs in the national economy, 550 in Kansas, and 30 in the local region. Ms. Boucher has not demonstrated that the ALJ erred in concluding that there were a significant number of jobs she could perform in the national economy.

The judgment of the district court is AFFIRMED.

Entered for the Court

Bobby R. Baldock
Circuit Judge

-14-